# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PHILADELPHIA INDEMNITY INSURANCE COMPANY, ) ) ) Plaintiff, ) ) v. ) ) THE BABY FOLD, INC. and THE CHICAGO ) TRUST CO., as Independent Administrator of ) the Estate of Kianna Rudesill, ) ) Defendants. ) | Case No. 16 C 10161<br><br>Judge Joan H. Lefkow |
| THE BABY FOLD, INC., ) ) Counter-Plaintiff, ) ) v. ) ) PHILADELPHIA INDEMNITY ) INSURANCE COMPANY and THE ) CHICAGO TRUST CO., as Independent ) Administrator of the Estate of Kianna Rudesill, ) ) Counter-Defendants. ) | |

## OPINION AND ORDER

Philadelphia Indemnity Insurance Company (PIIC) filed suit against The Baby Fold, Inc. (Baby Fold) and The Chicago Trust Company (Chicago Trust), as administrator of the estate of Kianna Rudesill (deceased),[1] seeking a declaration of insurance coverage with respect to certain underlying lawsuits. (Dkt. 1.) Baby Fold answered the complaint and filed a counterclaim similarly seeking a declaration of coverage. (Dkt. 13.) Chicago Trust later filed a counterclaim

---

[1] Chicago Trust replaced James Rudesill as the independent administrator of the estate of Kianna Rudesill. (*See* dkts. 38, 42.)

asking for yet a different variation of the declaration of coverage. (Dkt. 45.) PIIC now moves for dismissal of Chicago Trust's counterclaim. (Dkt. 56.) For the reasons stated below, PIIC's motion to dismiss is granted.[2]

## BACKGROUND[3]

**I.    The Underlying Lawsuit**

On or about September 30, 2013, a lawsuit was filed in the Circuit Court for the Twenty-First Judicial Circuit of Illinois, Kankakee County, styled *James Rudesill, as Administrator of the Estate of Kianna Rudesill, Deceased, v. The Baby Fold, an Illinois not-for-profit corporation, Joshua Lamie and Heather Lamie*, Case No. 2013-L-64. (Dkt. 1 ¶ 7.) This lawsuit was voluntarily dismissed and subsequently refiled on or about March 27, 2015 in the Circuit Court of Cook County, Law Division, captioned *James Rudesill, as Administrator of the Estate of Kianna Rudesill, Deceased, Plaintiffs, v. The Baby Fold, an Illinois not-for-profit corporation, Joshua Lamie and Heather Lamie, Individually and as agents of The Baby Fold; William Puga, M.D., Individually and as agent of BHC Streamwood Hospital, Inc., Defendants*, Case No. 2015-L-003146 (the Underlying Lawsuit). (*Id.* at ¶¶ 16–17.) At the time Chicago Trust filed its counterclaim in the present case, it sought to file an amended complaint in the Underlying Lawsuit but had not yet done so. (*See* dkt. 45-2.)

---

[2] The court's jurisdiction rests on 28 U.S.C. § 1332. Venue is proper pursuant to 28 U.S.C. § 1391(b).

[3] Unless otherwise noted, the following facts are taken from plaintiff's complaint and attachments incorporated therein and are presumed true for the purpose of resolving the pending motion. *Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011).

The Underlying Lawsuit arose out of the death of Kianna Rudesill, a child who died as a result of multiple blunt trauma injuries on May 4, 2011 while in the foster care of Joshua and Heather Lamie. (Dkt. 1 ¶¶ 8–9.) On October 7, 2014, Heather Lamie was convicted of Kianna's murder and was thereafter sentenced to life imprisonment, without the possibility of parole. (*Id.* ¶ 10.) The Underlying Lawsuit alleges that Baby Fold—a not-for-profit corporation that assists with foster care and adoption services—placed Kianna in the Lamies' home where they acted as foster parents from approximately August 20, 2010 through May 4, 2011. (Dkt. 1-3 ¶ 7.) It alleges that the Lamies committed intentional battery against Kianna and were negligent in failing to protect her from such injuries. (*See generally* dkt. 1-3.) Specifically:

> On or about May 2, 2011, and prior thereto, Heather Lamie committed acts of battery, assault, unlawful restraint, and other acts of violence upon the aforesaid Kianna Rudesill, inclusive of beating her head against a wall, causing her to suffer severe and permanent brain damage and ultimately death.
>
> For months prior to and up to the time of the battery and violence committed against Kianna Rudesill, case worker Analisa Greer, other case workers, respite workers and agents/employees had been specifically warned that the said minor child was bruised and was possibly being abused in the Lamie home, and were otherwise on notice that there was [sic] allegations of abuse in the Lamie home.

(*Id.* ¶¶ 8–9.)

It also alleges that Baby Fold was negligent in performing one or more of the following acts: (1) placing Kianna in the Lamies' home; (2) failing to remove Kianna from the Lamies' home once her wrists were found to be cut and she had to be admitted to Streamwood Behavioral Health Hospital; (3) failing to investigate reports of substantial bruising suffered by Kianna; (4) failing to take any action to investigate the Lamies' capacity to act as foster parents, while ignoring complaints of mistreatment; (5) failing to remove Kianna from the Lamies' home, with alleged "utter disregard" for the

3

physical harm Kianna suffered; (6) failing to adequately license the Lamies' home, and failing to supervise the licensing of the home; (7) failing to supervise and monitor the home for the safety of the children; (8) placing too many children, inclusive of children diagnosed with special needs, into the Lamies' home; and (9) ignoring that Heather Lamie had specifically requested help from Baby Fold because she was overwhelmed by the number of children in her home and their special needs. (Dkt. 1 ¶¶ 13, 19.) The Underlying Lawsuit asserts claims against Baby Fold and the Lamies in both negligence and willful and wanton conduct under the Illinois Wrongful Death Act, 740 ILCS 180-1, *et seq.* The most recent proposed amended complaint also adds a claim for survival. (*See* dkts. 1-3, 45-2.)

## II. The Insurance Policies

PIIC insured Baby Fold under two relevant insurance policies, each consisting of a primary and excess policy. The first ran from March 1, 2010 to March 1, 2011 (separately the 2010 Primary Policy and the 2010 Excess Policy or, collectively, the 2010 Policies) and the second ran from March 1, 2011 to March 1, 2012 (separately the 2011 Primary Policy and the 2011 Excess Policy or, collectively, the 2011 Policies). For purposes of this motion, the parties agree that the policies are identical.[4]

### A. The Commercial General Liability Coverage Form

Each primary policy contained a Commercial General Liability Coverage Form (the CGL Form), which provided coverage for damages because of "bodily injury" or "property

---

[4] Given that the relevant provisions of the 2010 Policies and 2011 Policies are identical, all citations to PIIC policies are to the 2010 Policies. (*See* 45-3, 45-4.)

damage." (*See* dkt. 45-3 at 169–184.) An endorsement titled "Abuse or Molestation Exclusion, Abuse or Molestation Sublimit," modified the CGL Form as follows:

> 1. Except to the extent coverage is provided in (2) below [not applicable here], this insurance does not apply to "bodily injury", "property damage", "personal and advertising injury", or any other "injury" arising out of:
>     a. the actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured, or
>     b. the negligent
>         i. employment;
>         ii. investigation;
>         iii. supervision;
>         iv. reporting to the proper authorities, or failure to so report; or
>         v. retention;
>     of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by (a) above.
>
> This exclusion shall apply regardless of the legal form any "suit" may take. As an example, this insurance shall provide no coverage for a claim alleging that an insured was negligent or in breach of contract due to the hiring of an employee accused of sexual abuse. However, notwithstanding the foregoing, the insured shall be protected under the terms of the policy as to any claim and/or allegation which may be covered by the policy upon which suit may be brought against the insured, for any such alleged behavior by an insured unless a judgment or final adjudication adverse to the insured shall establish that such behavior occurred as an essential element of the cause of action so adjudicated.

(*Id.* at 207.)

### B. The Sexual or Physical Abuse or Molestation Vicarious Liability Coverage Form

Each primary policy also contained a "Sexual or Physical Abuse or Molestation Vicarious Liability Coverage Form" (the SPAM Form). (*Id.* at 283–91). The SPAM Form Declarations outlined a limit for each occurrence of abusive conduct of $1 million and an aggregate limit of $3 million. (*Id.* at 61.) This insured Baby Fold against "damages" it was obligated to pay for "bodily injury" arising from "abusive conduct." (*See id.* at 283.) Each SPAM Form defined "abusive conduct" as:

5

> [E]ach, every and all actual, threatened or alleged acts of physical abuse, sexual abuse, sexual molestation or sexual misconduct performed by one person or two or more people acting together. Each, every and all actual, threatened or alleged acts of physical abuse, sexual abuse, sexual molestation or sexual misconduct committed by, participated in by, directed by, instigated by or knowingly allowed to happen by one or more persons shall be considered to be one "abusive conduct" regardless of:
>
> a. The number of injured parties;
> b. The period of time over which the acts of physical abuse, sexual abuse, sexual molestation or sexual misconduct took place; and
> c. The number of such acts or encounters.
>
> "Abusive conduct" consisting of or comprising more than one act of physical abuse, sexual abuse, sexual molestation or sexual misconduct shall be deemed to take place, for all purposes within the scope of this policy, at the time of the first such act or encounter.

(*Id.* at 287). The "Limit of Insurance" section, as amended, in each SPAM Form similarly provided that multiple claims for damages because of multiple claims of abuse would generally be considered a single claim, and that that claim would be "assigned" to only one insurance policy:

> 1. The limit of insurance shown in the Declarations and the rules below fix the most we will pay "damages" regardless of the number of:
>
>    a. Insureds;
>    b. Claims made or "suits" brought; or
>    c. Persons or organizations making claims or bringing "suits".
>
> 2. The limit of insurance shown in the Declarations for each "abusive conduct" is the most we will pay for all "damages" incurred as the result of any claim of "abusive conduct." Two or more claims for "damages" because of the same incident of "abusive conduct" will be considered a single claim, unless the "abusive conduct" is interrelated, at different times, and to different claimants, then each claim will be handled separately. Such claims, whenever made, shall be assigned to only one policy (whether issued by this or any other insurer) and if that is this policy, only one limit of insurance shall apply.

(*Id.* at 284, 291.) Each SPAM Form also included a series of "conditions," including the following relevant provision ("Condition 8"):

8. Two Or More Coverage Parts Or Policies Issued By Us

It is our stated intention that the various coverage parts or policy issued to you by us, or any company affiliated with us, do not provide any duplication or overlap of coverage for the same claim or "suit". We have exercised diligence to draft our coverage parts or policies to reflect this intention, but should the circumstances of any claim or "suit" give rise to such duplication or overlap of coverage then, notwithstanding the other insurance provision, if this policy and any other coverage part or policy issued to you by us, or any company affiliated with us, apply to the same "abusive conduct[,]" professional incident, occurrence, offense, wrongful act, accident or loss, the maximum limit of insurance under all such coverage parts or policies combined shall not exceed the highest applicable limit of insurance under any one coverage part or policy.

This condition does not apply to any Excess or Umbrella policy issued by us specifically to apply as excess insurance over this policy.

(*Id.* at 286.)

**C.   The Excess Policies**

The excess policies contained an aggregate limit of $5 million and a limit per occurrence of $5 million, as outlined in the declarations. (Dkt. 45-4 at 1.) These policies covered:

[T]he "ultimate net loss" in excess of the "applicable underlying limit", whether or not collectable, which the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies caused by an "occurrence" or "personal injury" or "advertising injury" to which this insurance applies caused by an "offense" which:

   a. Occurs, or is committed during the policy period and
   b. Occurs, or is committed in the "Coverage Territory".

(*Id.* at 15.) "Applicable Underlying Limit" was defined as:

a. If the policies of "underlying insurance" apply to the "occurrence" or "offense", the greater of:

   1. The amount of insurance stated in the policies of "underlying insurance" in the Declarations or any other available insurance less the amount by which any aggregate limit so stated has been reduced solely due to payment of claims; or

7

>   2. The "retained limit" shown in the Declarations or
>
>   b. If the policies of "underlying insurance" do not apply to the "occurrence" or "offense", the amount stated in the Declarations as [sic] the "retained limit".

(*Id.* at 26). "Underlying Insurance" meant "the policies in the Schedule of Underlying Insurance." (*Id.* at 28.) The Schedule of Underlying Insurance provided the same $1 million per occurrence and $3 million aggregate limits for abuse and molestation coverage as contained in the primary policies, and thus applied to the conduct at issue. (*Id.* at 3.) The retained limit was $10,000 (*id.* at 1), so the "applicable underlying limit," or the greater of $1 million or $10,000, was $1 million in this case. The excess policies therefore covered "the ultimate net loss" in excess of $1 million.

Finally, the excess policies contained an endorsement titled Sexual or Physical Abuse or Molestation Liability Coverage Form Sublimit (the "SPAM Sublimit Endorsement"), which modified the excess policies as follows:

> This policy is intended to include the Sexual or Physical Abuse or Molestation Liability Coverage form, but only with the limits set forth below. These limits are included within, and not excess of, nor in addition to the Limits of Insurance stated in the Declarations.
>
> SEXUAL OR PHYSICAL ABUSE OR MOLESTATION LIABILITY COVERAGE SUBLIMITS:
>
> Each "Abusive Conduct" Limit: $250,000
> Aggregate Limit: $500,000
>
> All other terms and conditions of this Policy remain unchanged.

(*Id.* at 12.)

## III. The Parties' Arguments

PIIC's complaint seeks a declaration that coverage under the primary and excess policy at issue is limited to $1.25 million. (Dkt. 1 at ¶¶ 66–70.) PIIC asserts that the limit

8

of liability provided to Baby Fold for the Underlying Lawsuit is the $1 million limit of liability provided by the SPAM Form in the primary policy, and the $250,000 sublimit of liability provided by the excess policy for claims under the SPAM Form. (*Id.* at ¶ 68.) Baby Fold's counterclaim asserts that potential coverage for the Underlying Lawsuit under the excess policy is $5 million, not the $250,000 limit that PIIC contends. (Dkt. 13 at 22–28.) Neither PIIC nor Baby Fold asserts that more than one primary or excess policy is at issue.

Chicago Trust's counterclaim—which PIIC now moves to dismiss—seeks the following declarations:

1. Count I: that both the 2010 Primary Policy and 2010 Excess Policy are triggered and therefore afford coverage to Baby Fold for the bodily injury sustained by Kianna Rudesill during the 2010 policy period;

2. Count II: that both the 2010 Excess Policy and 2011 Excess Policy provide coverage to Baby Fold up to $5 million per occurrence and $5 million in the aggregate for the bodily injury sustained by Kianna Rudesill; and

3. Count III: that both the 2010 Excess Policy and 2011 Excess Policy provide SPAM liability coverage to Baby Fold, with limits up to $250,000 per occurrence and $500,000 in the aggregate.

(Dkt. 45 at ¶¶ 37–61.) Baby Fold opposes PIIC's motion to dismiss only as it pertains to count II of Chicago Trust's counterclaim.

**LEGAL STANDARD**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges a complaint for failure to state a claim upon which relief may be granted. In ruling on a Rule 12(b)(6) motion, the court accepts as true all well-pleaded facts in the plaintiff's complaint and

draws all reasonable inferences from those facts in the plaintiff's favor. *Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011); *Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also establish that the requested relief is plausible on its face. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009); *Bell Atl.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007). The allegations in the complaint must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. At the same time, the plaintiff need not plead legal theories; it is the facts that count. *Hatmaker* v. *Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010); *see also Johnson* v. *City of Shelby*, 135 S. Ct. 346, 346 (2014) (per curiam) ("Federal pleading rules call for a short and plain statement of the claim showing the pleader is entitled to relief; they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.").

## ANALYSIS

**I.      Insurance Policy Interpretation**

Under Illinois law,[5] the interpretation of "an insurance policy contract is a question of law" for the court to resolve. *United Nat. Ins. Co.* v. *Dunbar & Sullivan Dredging Co.*, 953 F.2d 334, 337 (7th Cir. 1992). An insurance policy, like any contract, must be construed to effectuate the intent of the parties as derived from the plain meaning of the policy's terms, unless the contract is ambiguous. *Gallagher* v. *Lenart*, 874 N.E.2d 43, 58, 226 Ill. 2d 208 (Ill. 2007). A contract is ambiguous only if it is susceptible to more than one interpretation, but an ambiguity will not be found solely because the parties disagree on its meaning. *Steadfast Ins. Co.* v. *Auto*

---

[5] The parties do not dispute that Illinois law applies and cite to Illinois state cases for support of their arguments related to insurance policy interpretation. The court thus applies Illinois law.

*Mktg. Network, Inc.*, No. 97 C 5696, 2001 WL 881354, at *3 (N.D. Ill. Aug. 2, 2001). Further, "because words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others." *Gallagher*, 874 N.E.2d at 58.

## II. Coverage Under Multiple Policies

Counts II and III of Chicago Trust's counterclaim seek a declaration that there is coverage under both the 2010 and 2011 Excess Policies for the Underlying Lawsuit. PIIC argues that its liability for abusive conduct as alleged in the Underlying Lawsuit is limited to a single primary and excess policy year. In support, PIIC points to the definition of "abusive conduct" and paragraph 2 of the limit of insurance in the SPAM Form (both outlined above).[6]

Pursuant to the definition of "abusive conduct," regardless of the misconduct being "performed by one person or two or more people acting together," "[t]he period of time over which the acts of physical abuse . . . took place," and "[t]he number of such acts or encounters," such misconduct is "deemed to take place, for all purposes within the scope of this policy, at the time of the first such act or encounter." PIIC thus contends that if the "abusive conduct" by the Lamies first took place during the 2010 policy period, both the 2010 and 2011 Policies would deem the "abusive conduct" to have taken place during the 2010 policy period. Chicago Trust hones in on the phrase "within the scope of this policy," and argues that the definition of "abusive conduct" applies only to the policy in which it is contained and thus multiple policy periods could be at issue.

---

[6] Baby Fold asserts that whether both the 2010 and 2011 Excess Policies are available for coverage cannot be decided at this time because there has been no determination made in the Underlying Lawsuit as to whether there was an occurrence during the 2010 policy period.

11

PIIC counters that paragraph 2 of the limit of insurance in the SPAM Form of the primary policies (as amended), clarifies that although multiple policies may be triggered by occurrences over multiple policy periods, the limit for insurance for all such occurrences is deemed to be the limit of liability provided in the first of the policies:

> Two or more claims for "damages" because of the same incident of "abuse conduct" will be considered a single claim, unless the "abusive conduct" is interrelated, at different times, and to different claimants, then each claim will be handled separately. Such claims, whenever made, shall be assigned to only one policy (whether issued by this or any another [sic] insurer) and if that is this policy, only one limit of insurance shall apply.

Chicago Trust misquotes this language, adding the words "each specific policy"[7] to the above provision and then concludes that "each specific policy" is at issue, or that at a minimum the provision is ambiguous.

In support of its arguments, PIIC points to *Phil. Indem. Ins. Co.* v. *Olympia Early Learning Ctr.*, 980 F. Supp. 2d 1266 (W.D. Wash. 2013) ("*Olympia*"). In that case, PIIC insured Olympia under policies containing essentially the same definition of "abusive conduct" as the policies at issue here. The court concluded that "the limit of insurance available for bodily injury arising from multiple claims of abuse over multiple policy periods is exactly and only $1 million." *Id.* at 1273.[8]

---

[7] Specifically, Chicago Trust states: "Section III – Limits of Insurance, sets forth that the 'limit of insurance shown in the Declarations for **each specific policy** for each 'abusive conduct' is the most we will pay . . . Such claims, whenever made, shall be assigned to only one policy . . . and if that is **this policy**, only one limit of insurance shall apply.'" (Dkt. 64 at 7 (emphasis in original)). The policy language does not include the bolded words "each specific policy."

[8] Chicago Trust concedes that *Olympia* is based on the same policy forms at issue in the present case, but contends that *Olympia* is not controlling because it was decided under Washington law. Because Washington and Illinois contract interpretation laws are substantially similar, this argument is without merit. Chicago Trust also points to *Roman Catholic Diocese of Joliet, Inc.* v. *Interstate Fire Ins. Co.*, 685 N.E.2d 932, 939, 292 Ill. App. 3d 447 (Ill. App. Ct. 1997), in which the court held that where "the negligent supervision of a priest manifests itself as abuse in multiple policy periods, the negligent supervision constitutes an occurrence in each policy period and each policy's coverage is triggered by the

Under the clear, unambiguous policy language at issue, either the 2010 Policies or the 2011 Policies apply to the Underlying Lawsuit, but not both. The SPAM Form clearly provides that where there are multiple claims of abuse over multiple policy periods, all those events are "deemed to take place" during the first triggered policy period, and that multiple claims for damages are, for limits purposes, considered a single claim and assigned only to a single policy.

## III. Coverage Under the Excess Policies

Counts II and III of Chicago Trust's counterclaim also seek a declaration that certain amounts of coverage apply under the excess policies. As noted above, either the 2010 or 2011 Excess Policy will apply, so the remaining question is whether the relevant excess policy provides a limit of $250,000 per occurrence (PIIC's contention), $5 million per occurrence (Baby Fold's contention), or $5.25 million per occurrence (Chicago Trust's contention). The parties make numerous (often strained) arguments in support of their positions, the most pertinent of which are summarized below.

PIIC argues that because the SPAM Sublimit Endorsement "is intended to include" the SPAM Form from the primary policy, but "only with the limits set forth below,"—$250,000 per each "abusive conduct" and $500,000 in the aggregate—coverage for sexual or physical abuse or molestation is limited to $250,000, rather than the $5 million per occurrence provided for in the declarations of the excess policies. PIIC also notes that the first line of the endorsement reads: "This Endorsement Changes The [Excess] Policy," meaning the $5 million limit in the declarations is changed to $250,000 under a plain reading of the SPAM Sublimit Endorsement. Further, PIIC focuses on the word "sublimit," stating that this word clearly establishes that for physical abuse only, the excess policy limit is not $5 million, but instead the lower sublimit

---

first instance of abuse occurring during its period of coverage." That case, however, is based on different policy language and thus does not carry the same force as the parallel PIIC draws to *Olympia*.

13

established in the SPAM Sublimit Endorsement ($250,000). PIIC maintains that Chicago Trust and Baby Fold's positions improperly read the SPAM Sublimit Endorsement out of the excess policies entirely.

Chicago Trust contends that the SPAM Sublimit Endorsement does not alter, modify, limit or otherwise change the $5 million per occurrence outlined in the declarations of the excess policy. In support, Chicago Trust points to the language at the end of the endorsement—"All other terms and conditions of this Policy remain unchanged"—and concludes that the SPAM Sublimit Endorsement not only does not limit the excess policy but is also meant to include additional coverage. Chicago Trust also points to Condition 8 in the primary policy, which states that various parts or policies "do not provide any duplication or overlap," and notes that this condition "does not apply to any Excess . . . policy." In other words, Chicago Trust argues that the excess policies provide for $5 million per occurrence as outlined in the declarations and include $250,000 per occurrence pursuant to the SPAM Sublimit Endorsement. Chicago Trust also notes that PIIC did not limit or exclude sexual abuse and molestation coverage, as it did under certain circumstances in the primary policy, and that PIIC did provide exclusions for other types of liability (*e.g.*, director and officer liability and employee benefits liability). Thus, "[t]o the extent PIIC contends otherwise, such coverage under the [SPAM Sublimit Endorsement] is illusory." (Dkt. 64 at 14.)

Baby Fold agrees that the $5 million per occurrence stated in the declarations of the excess policies applies to coverage for the Underlying Lawsuit; it does not comment on whether the $250,000 per occurrence limit included in the SPAM Sublimit Endorsement provides additional coverage as Chicago Trust contends. Like Chicago Trust, Baby Fold argues that the SPAM Form is incorporated into the excess policy but does not replace or limit the $5 million

14

per occurrence coverage limit designated in the excess policies' declarations. It also contends that because the SPAM Form and the SPAM Sublimit Endorsement use the word "abusive conduct," while the general coverage under the excess policies uses the word "occurrence," the SPAM Sublimit Endorsement is not relevant to construing the general $5 million coverage limit. Finally, Baby Fold argues that where, as here, the Underlying Claims are covered under two forms with different limits within the same policy, Condition 8 specifies that the higher limit applies. (*See* dkt. 45-3 at 286 ("should the circumstances of any claim or 'suit' give rise to such duplication or overlap of coverage . . . the maximum limit of insurance under all such coverage parts or policies combined shall not exceed the highest applicable limit of insurance under any one coverage part or policy")).

A plain reading of the SPAM Sublimit Endorsement makes clear that a $250,000 limit for each abusive conduct applies under the relevant (either 2010 or 2011) excess policy. The endorsement first states that it modifies the excess policy, meaning that it changes the excess policy in some way. It goes on to explain that the excess "policy is intended to include" the SPAM Form, "but only with the limits set forth below." These limits are $250,000 per each abusive conduct and $500,000 in the aggregate. The SPAM Form is thus incorporated into the excess policy, but with modified limits—instead of including a $1 million limit for each abusive conduct as outlined in the SPAM Form declarations, the SPAM Sublimit Endorsement includes only a $250,000 limit for each abusive conduct. To put a fine point on it, "[t]he very concept of a sublimit is to cap a carrier's exposure at an amount below the policy limit if a particular type of covered peril caused the loss." *Orient Overseas Assocs.* v. *XL Ins. Am., Inc.*, No. 652292, at *25 (N.Y. Sup. Ct. May 11, 2016).

The endorsement also notes that the "limits are included within, and not excess of, nor in addition to the Limits of Insurance stated in the Declarations." Thus, contrary to Chicago Trust's argument that the $250,000 limit in the SPAM Sublimit Endorsement applies in addition to the $5 million in the excess policies' declarations, the endorsement explicitly states that this is not the case. *See Formosa Plastics Corp., U.S.A.* v. *ACE Am. In. Co.*, No. 06-5055, 2010 WL 4687835, at *7 (D. N.J. Nov. 9, 2010) (Glossary of Insurance Risk Management defining "sublimit" as "[a] limitation in an insurance policy on the amount of coverage available to cover a specific type of loss. A sublimit is part of, rather than in addition to, the limit that would otherwise apply to the loss. In other words, it places a maximum on the amount available to pay that type of loss, rather than providing additional coverage for that type of loss"). Condition 8 does not alter this conclusion as it is specifically "does not apply to any Excess . . . policy." And the phrase "[a]ll other terms and conditions of this Policy remain unchanged" in the SPAM Sublimit Endorsement simply cabins the modifications of the endorsement to sexual or physical abuse or molestation liability coverage.

Quite simply, PIIC modified the excess policies with an endorsement that both incorporated the SPAM Form from the primary policies and changed the each abusive conduct and aggregate limits while leaving the rest of the excess policy intact.

## IV. Coverage Under the 2010 Policies

In count I of its counterclaim, Chicago Trust also seeks a declaration that both the 2010 Primary Policy and 2010 Excess Policy are triggered and therefore afford coverage to Baby Fold for the bodily injury Kianna Rudesill sustained during the 2010 policy period. PIIC is currently defending Baby Fold under the 2011 Primary Policy, subject to a reservation of rights, and neither PIIC nor Baby Fold has put the 2010 Policies at issue.

16

As Chicago Trust points out, the Underlying Lawsuit alleges that Kiana Rudesill lived with the Lamie family from approximately August 20, 2010 through May 4, 2011; that in about May 2011, and prior thereto, Heather Lamie committed acts of violence upon Kianna; and that for months prior to and up to the time of the battery and violence committed against Kianna, caseworkers and agents/employees of Baby Fold were warned that Kianna was bruised and possibly being abused in the Lamie home. Because the 2010 policy period runs from March 1, 2010 to March 1, 2011, Chicago Trust contends that the Underlying Lawsuit alleges that Kianna sustained bodily injury, as a result of an occurrence, during the 2010 policy period and thus the 2010 Policies should be triggered.

These allegations, however, are just that. There has been no finding in the Underlying Lawsuit that definitively establishes when the relevant conduct occurred. Yet this court need not make such a finding given that the relevant language in the 2010 Policies and 2011 Policies is identical for purposes of this motion. The issue is moot.[9]

**CONCLUSION AND ORDER**

For the foregoing reasons, PIIC's motion to dismiss [56] is granted. The subject policy language is not ambiguous and necessitates a declaration that (a) either the 2010 Policies or the 2011 Policies (not both) apply to coverage for the Underlying Lawsuit; (b) the limits available

---

[9] Chicago Trust argues that PIIC waived its coverage defenses under the 2010 Policies by not including these policies in its declaratory judgment action and not reserving rights in its motion to dismiss. This argument is without merit. Baby Fold has never sought coverage under the 2010 Policies, and PIIC has been defending Baby Fold under the 2011 Policies subject to a reservation of rights. "Where the complaint presents a case of potential coverage, the insurer must either defend under a reservation of rights or seek a declaratory judgment that there is no coverage." *Sportmart, Inc.* v. *Daisy Mfg. Co.*, 645 N.E.2d 360, 364, 268 Ill. App. 3d 974 (Ill. App. Ct. 1994). PIIC is defending under a reservation of rights and also sought a declaratory judgment. Further, at the time PIIC filed its declaratory judgment action, Chicago Trust's motion for leave to file an amended complaint had not yet been granted and the Underlying Lawsuit was stayed. There was thus no duty to defend the allegations made in the not-yet-operative complaint.

under the relevant excess policy are $250,000 per abusive conduct and $500,000 in the aggregate; and (c) whether the 2010 Policies or 2011 Policies apply will depend on findings made in the Underlying Lawsuit and need not be decided by this court—the issue is moot given that the relevant language in the 2010 Policies and 2011 Policies is identical.

Date:  September 26, 2018

_____
U.S. District Judge Joan H. Lefkow